**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SONGIE ADEBIYI, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 20-cv-2031 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| SOUTH SUBURBAN COLLEGE, and | ) | |
| DONALD MANNING, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Songie Adebiyi, an African-American woman, worked for nearly two decades as an administrator at South Suburban College. The school raised a number of performance issues with her over the years. Things finally came to a head in 2019 when the new President, an African-American woman, decided to let her go.

Adebiyi believed that the termination had nothing to do with her job performance. Instead, she thought that the College had discriminated against her based on her race. And the College, in her view, was simply retaliating against her for complaining to the EEOC nine months earlier.

Adebiyi filed suit against the College and its former President, advancing claims of race discrimination, retaliation, and breach of contract. After discovery, Defendants filed for summary judgment on all claims. In response, Adebiyi agreed that her race discrimination claims lack merit. So only the retaliation claim and the breach of contract claim remain at issue.

For the reasons stated below, Defendants' motion for summary judgment is granted.

**Background**

Before diving into the facts, the Court offers one prefatory note. Defendants supported their motion for summary judgment with a statement of material facts, as required by the Local Rules. *See* Defs.' Statement of Facts (Dckt. No. 34). Adebiyi filed a response, but it was largely non-responsive. *See* Pl.'s Resp. to Defs.' Statement of Facts (Dckt. No. 36). She did not respond to 45 of the 79 paragraphs. *Id.*; *see also* L.R. 56.1(e)(2) ("Each response must admit the asserted fact, dispute the asserted fact, or admit in part and dispute in part the asserted fact."). As a result, the Court accepts any properly supported fact in Defendants' Rule 56.1 statement that Adebiyi did not dispute with citations to evidence in the record. *See* L.R. 56.1(e)(3).[1]

In 2000, Songie Adebiyi, an African-American woman, started working at South Suburban College. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 1 (Dckt. No. 36). South Suburban is a public community college in suburban Cook County. *Id.*

Adebiyi started as a manager within the division of student services. *Id.*; Adebiyi Dep., at 9:8 – 10:3 (Dckt. No. 34-1). She rose through the ranks over the years, eventually becoming the Vice President of Student and Enrollment Services. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 1 (Dckt. No. 36). In that role, Adebiyi oversaw a number of departments and programs, including the counseling department. *Id.* at ¶ 5.

---

[1] Adebiyi also misnumbered the paragraphs in her response, creating potential confusion. There are 79 paragraphs in Defendants' statement of facts, but only 78 paragraphs in Plaintiff's response. *Compare* Pl.'s Resp. to Defs.' Statement of Facts (Dckt. No. 36), *with* Defs.' Statement of Facts (Dckt. No. 34). Plaintiff combined Defendants' paragraphs 2 and 3, and responded to them together. The response to Defendants' paragraph 4 appears in Adebiyi's paragraph 3. (Actually, there is no response to paragraph 4, but you get the concept.) So, for example, the response to Defendants' paragraph 16 appears in Adebiyi's paragraph 15, and so on. If you want to find Adebiyi's response to a particular paragraph in Defendants' statement of facts, look at the paragraph number in Defendants' statement, and then subtract one.

South Suburban has a traditional management structure. The Board of Trustees manages the College. *Id.* at ¶ 3. The President reports to the Board, and an executive leadership team reports to the President. *Id.*

For most of Adebiyi's tenure as a Vice President, Donald Manning (a white man) was the President. *Id.* President Manning retired in 2018, and the Board replaced him with Dr. Lynette Stokes, who was formerly the Vice President of Academic Services. Dr. Stokes is an African-American woman. *Id.*

Adebiyi was on the executive leadership team. The team also included Dr. Stokes[2] (and her eventual replacement as Vice President of Academic Services, Dr. Tasha Williams), Martin Lareau (the Vice President of Administrative Services), Dr. Ronald Kawanna (the Associate Vice President of Institutional Effectiveness and Accreditation), and Patrick Rush (the Executive Director of Public Relations and Marketing). *Id.*

By 2018, Adebiyi had worked at South Suburban for nearly two decades, but not everyone was pleased with her job performance. *Id.* at ¶¶ 1, 10. In April 2018, the President of the Faculty Union (G.A. Griffin) requested a meeting to discuss Adebiyi's performance. *Id.* at ¶ 10. He asked to meet with President Manning, Dr. Stokes, and Human Resources Director Kim Pigatti. *Id.* At that point, Dr. Stokes was not yet the new President, but the Board had already approved her promotion, effective October 2018. *Id.* at ¶¶ 4, 10.

The meeting took place soon after. The parties don't provide the date, but the Court infers that the meeting took place on April 17, 2018.[3]

---

[2] Dr. Stokes served as a Vice President, and then as the President, during the period at issue in this case. The parties refer to her as both Dr. Stokes and President Stokes. For the sake of simplicity, the Court will refer to her as "Dr. Stokes" throughout, even though she was President Stokes during part of the time.

[3] The Court draws that inference because Adebiyi asked for medical leave from April 18 until May 1, 2018 "[t]he day after" Adebiyi's subsequent meeting with Dr. Stokes. *See* Pl.'s Resp. to Defs.' Statement

During that meeting, Griffin explained that several counselors and employees in the Student Services Department had complained to the Faculty Union about Adebiyi's leadership style. *Id.* at ¶¶ 10–11. People complained that Adebiyi enabled a toxic work environment in the counseling department. *Id.*

After the meeting, President Manning asked Dr. Stokes to reach out to Adebiyi to talk about the allegations. *Id.* at ¶ 12. With his retirement impending, President Manning thought that Dr. Stokes was in the best position to talk with Adebiyi as the President-elect.

Dr. Stokes spoke with Adebiyi, and then reported back to President Manning. Dr. Stokes told President Manning that the complaints about Adebiyi were unfounded. *Id.*

But Adebiyi was irked by the complaints. The day after the meeting with Dr. Stokes, Adebiyi requested medical leave from April 18 to May 1, 2018. *Id.* at ¶ 13. And then on May 1, 2018, Adebiyi submitted a formal complaint to the College alleging race discrimination, retaliation, and bullying. *Id.* at ¶ 14. On May 17, 2018, she filed an EEOC charge alleging harassment, retaliation, and unequal pay based on her race and gender. *Id.* at ¶ 2.

In her EEOC charge, Adebiyi alleged that various staff members harassed her by spreading rumors, raising false allegations, demeaning her, and sabotaging her work. *Id.*; *see* EEOC Charge (Dckt. No. 34-2, at 55–57 of 72). She alleged that President Manning had "purposely ignored [her] when she attempted to discuss issues with him and also subjected [her] to harassment." *See* EEOC Charge, at 56 of 72. Adebiyi also alleged that in February 2018, she found out "that non-black employees with comparable job titles and a workload similar to [Adebiyi's], were getting paid substantially more." *Id.* at 57 of 72.

---

of Facts, at ¶ 13 (Dckt. No. 36). The Court assumes – but does not know for sure – that the meeting and the subsequent meeting between Dr. Stokes and Adebiyi took place on or before April 17.

The College investigated her complaint. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 18 (Dckt. No. 36). Pigatti (again, the Director of Human Resources) and Patrice Burton (the Dean of Student Services) wrote a report on their findings in early July 2018. *Id.* They found no evidence to support Adebiyi's allegations. *Id.*

But Pigatti and Dean Burton did note a lot of miscommunication and mistrust in the counseling department. So they recommended that all counseling staff, including Adebiyi, participate in a communication training plan. *Id.* And they recommended that Adebiyi complete a Communication Pathway Chart for the department. *Id.*

President Manning and Pigatti shared the results of their investigation, including the report, with Adebiyi on July 25, 2018. *Id.* at ¶ 19. Adebiyi, in turn, submitted an objection to the report's findings. *Id.* The Board upheld the recommendations. *Id.*

Meanwhile, Adebiyi and the College butted heads on a few other topics. Adebiyi complained about the late payment of a stipend, and about the handling of her computer.

Turning to the stipend, at some point during President Manning's tenure (the parties don't reveal when) the College gave Adebiyi the responsibility of overseeing its Title IX investigations. *Id.* at ¶ 23. She wasn't the only person who received additional responsibilities. *Id.* The College also gave Lareau (the Vice President of Administrative Services) the task of overseeing FOIA requests, and gave Dr. Kawanna (the Associate Vice President of Institutional Effectiveness and Accreditation) the task of overseeing claims under the Family Educational Rights and Privacy Act ("FERPA"). *Id.* Of those three, Adebiyi was the only one who received a stipend for her extra work. *Id.*

Adebiyi started receiving a stipend after another member of the team who did the Title IX investigations (Dean Burton) requested a stipend for her additional work. *Id.* at ¶ 24. President

Manning agreed. *Id.*; *see also* Serna Dec., at ¶ 5 (Dckt. No. 34-5). President Manning approved a stipend for both Dean Burton and Adebiyi, running from February to June 2018. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 24 (Dckt. No. 36).

Initially, Adebiyi's annual stipend for the additional Title IX work was $12,089.20, which was prorated to $5,114.62. *Id.* The annual stipend went up to $13,171.90 for 2019. *Id.* at ¶ 27.

The stipend apparently didn't arrive on time. Adebiyi stated in her declaration that the College "only paid [me] retroactively for 2018," and did so after she complained. *See* Adebiyi Dec., at ¶ 5 (Dckt. No. 36-3); *see also id.* at ¶ 11; Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 27, 29 (Dckt. No. 36). The record does not reveal when Adebiyi complained, or how many times she complained, or how long she had to wait for her funds after she started complaining. So the record is silent on how long Adebiyi waited after she raised an issue.[4]

Ultimately, Adebiyi does not offer any evidence that the College failed to pay her a stipend in fiscal year 2018 or 2019. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 29 (Dckt. No. 36). Instead, she takes issue with the timing of the payments, including the fact that she received some of the payments after she complained.

The record reflects that Adebiyi received a $300 stipend every other week from February 15, 2018 to May 11, 2018. *See* Serna Dec., at ¶ 4 (Dckt. No. 34-5). The next stipend payment

---

[4] Adebiyi also makes a reference to never receiving a stipend in 2017. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 27 (Dckt. No. 36) ("She was not paid her 2017 stipends."). There are a few issues with this reference. First, neither party explains what the 2017 stipend is. Since the Title IX stipend started in 2018, not 2017, the Court does not know if the 2017 stipend relates to Title IX work or something else. Second, and more importantly, Adebiyi argues that South Suburban retaliated against her for filing an EEOC Charge in May 2018. *See* Pl.'s Resp., at 6 (Dckt. No. 37). Chronologically, it doesn't make sense for retaliation (not receiving the 2017 stipend) to occur before the protected activity (the 2018 EEOC Charge). Adebiyi has failed to otherwise explain how the 2017 stipend relates to the retaliation allegations, so the Court disregards Adebiyi's statements about the 2017 stipend.

did not come until August 31, 2018. *Id.* at ¶ 8. That's when Adebiyi received a retroactive payment of $2,026.45, which likely reflects four missed payments of $506.61. *Id.* On September 14, 2018, Adebiyi received another retroactive payment of $1,013.25, which likely reflects two payments of $506.61. *Id.* From September 28, 2018 forward, she received $506.61 every other week. *Id.*

Some of the payments were retroactive. *Id.* at ¶¶ 7–10. The reason for the retroactivity is not perfectly clear, but it appears that the stipend amount went up at least once, so there was a catch-up payment to reflect the increase. *Id.* It also appears that the College did not approve stipend payments for fiscal year 2019 (which starts in July 2019) until August 2018, so Adebiyi received retroactive payments for the first few months.

The key point is that the College missed a few stipend payments from mid-May to August 2018. But then it made up the ground, and paid Adebiyi retroactively.

In her filing, Adebiyi points out that another administrator, not President Manning, approved her stipend for fiscal year 2019. "The College only paid Adebiyi retroactively for 2018 following her complaint . . . and also it was Zucharrelli that issued the directive for Manning to pay the stipend in 2019 as Manning had failed to approve it." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 27, 29 (Dckt. No. 36).

Whatever the reason for any modest delay in receiving payment, President Manning wasn't to blame. President Manning was not involved in any delays in payments to Adebiyi for the Title IX stipend. *See* Serna Dec., at ¶ 9 (Dckt. No. 34-5).

Meanwhile, Adebiyi's base pay didn't stay the same. It went up. Specifically, her base pay increased from $108,307 in fiscal year 2018 (when she filed her EEOC complaint) to

$131,719 in fiscal year 2019. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 7 (Dckt. No. 36). For fiscal year 2019, Adebiyi's base pay went up $20,502. *Id.* at ¶ 27.

The stipend wasn't the only issue. On September 19, 2018, Adebiyi sent an email to President Manning and two IT employees, making a serious accusation. She "accus[ed] two unnamed IT employees of covertly entering her office afterhours to install software recording her personal data and then placing personal emails on the college network." *Id.* at ¶ 37. President Manning directed the head of the IT Department to investigate. *Id.* The College hired a third-party forensic firm to examine Adebiyi's computer. *Id.* at ¶¶ 38–40.

The day after the accusation, President Manning spoke directly with Adebiyi. He let Adebiyi know that the IT department would launch an immediate investigation. *Id.* at ¶ 39. He asked for details, including who entered her office, and when. *Id.* The President also reported that the College's police department needed to take possession of her computer for chain of custody reasons. *Id.* Adebiyi would receive a temporary computer in the meantime. *Id.*

The head of the IT department then came to Adebiyi's office with two officers from the College's police department and took possession of her computer. *Id.* at ¶ 40. They placed the computer in their safe, which was under 24-hour video surveillance, until the forensic team could examine the hard drive. *Id.* In the meantime, the head of the IT department asked Adebiyi for more information. *Id.* at ¶ 41.

The forensic examination "showed that none of her accusations related to her computer were true." *Id.* at ¶ 42. The College spent over $7,000 for the forensic exam. *Id.*

Adebiyi didn't buy the fact that the forensic exam came up empty. She calls it a "forensic audit ruse." *Id.* The forensic exam did not "change her conclusion that her files were accessed based on her personal observations." *Id.* Adebiyi continues to believe that someone

accessed her files, and she contends that using two College police officers to collect her computer "intimidated" her.  *See* Adebiyi Dec., at ¶ 12 (Dckt. No. 36-3).

In October 2018, President Manning retired, and Dr. Stokes took the reins as the President of South Suburban.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 5 (Dckt. No. 36). As President, Dr. Stokes began receiving more information about Adebiyi's job performance.

In November 2018, Dr. Stokes received a copy of the report from July 2018 about Adebiyi's race discrimination complaint.  *Id.* at ¶ 47.  And for the first time, Dr. Stokes received a document that the Faculty Union had provided to President Manning.  *Id.* at ¶ 48.  That document listed critical statements from counseling department employees about Adebiyi and provided documentation supporting the employees' concerns.  *Id.*

In the following months, Dr. Stokes held a number of meetings with Adebiyi that prompted new concerns about Adebiyi's overall job performance.  *Id.* at ¶ 50.

For example, by the fall of 2018, Adebiyi still hadn't created the Communication Pathway Chart, meaning the chart recommended in Pigatti and Dean Burton's report.  *Id.* at ¶ 50(a).  Dr. Stokes had to follow-up repeatedly with Adebiyi about completing that task.  *Id.* Adebiyi also refused to participate in the recommended training class, eventually bringing a doctor's note to excuse her performance.  *Id.* at ¶¶ 50(b), 51.

Dr. Stokes also worried about the effectiveness of Adebiyi's leadership style.  Dr. Stokes was concerned that Adebiyi took a hands-off approach to leading her department.  *Id.* at ¶ 50(e). She noted complaints from Deans and counselors that Adebiyi failed to give clear direction, guidance, or support.  *Id.*  And she noticed that Adebiyi only scheduled meetings with her direct reports, instead of meeting with other employees in her department.  *Id.* at ¶ 50(c).  Dr. Stokes thought that Adebiyi demonstrated poor interpersonal skills and isolated herself in the College.

*Id.* at ¶ 50(k).  As a result, Dr. Stokes thought that Adebiyi created a toxic work environment where interpersonal issues escalated quickly.  *Id.* at ¶¶ 50(e), 50(h).

Dr. Stokes had other concerns, too, above and beyond Adebiyi's people-management skills.  When Dr. Stokes asked about requisitions in the budget, including the purpose of certain expenditures, Adebiyi couldn't answer the questions.  *Id.* at ¶ 50(d).  Adebiyi responded that she just did what she was told.  *Id.*  And Dr. Stokes noticed that Adebiyi generally lacked a sense of urgency when addressing time-sensitive matters.  *Id.* at ¶ 50(j).

Adebiyi's stipend also concerned Dr. Stokes.  If anything, the College treated Adebiyi better, not worse, than her colleagues.  Dr. Stokes noticed that Adebiyi received $13,000 on top of her salary to serve as Title IX Liaison.  *Id.* at ¶ 7.  Some of her colleagues received no stipend at all, despite assuming additional work.  *Id.* at ¶¶ 7, 50(l).

Specifically, Dr. Kawanna (again, the Associate Vice President of Institutional Effectiveness and Accreditation) didn't receive a stipend for serving as the FERPA Liaison.  *Id.*  And Lareau (the Vice President of Administrative Services) didn't receive a stipend for serving as the FOIA officer, either.  *Id.*

Dr. Stokes ultimately gave Adebiyi a job performance appraisal in January 2019 and rated her as "satisfactory" for "most items."  *Id.* at ¶ 59.  For context, during President Manning's tenure, he mostly rated Adebiyi as "satisfactory" as well.  *Id.* at ¶ 60.

The parties disagree about the significance of the Adebiyi's 2019 job performance appraisal.  South Suburban offers evidence that Dr. Stokes viewed a "satisfactory" rating as deficient for a Vice President.  *See* Defs.' Statement of Facts, at ¶ 60 (Dckt. No. 34); Stokes Dec., at ¶ 20 (Dckt. No. 34-6).  Dr. Stokes rated the other employees who reported directly to her as "more than satisfactory."  *See* Defs.' Statement of Facts, at ¶ 60; Stokes Dec., at ¶ 20.

10

But Adebiyi viewed her ratings differently. She offers evidence that her feedback and experience with the College indicated that a "satisfactory" rating was sufficient. *See* Adebiyi Dec., at ¶ 21 (Dckt. No. 36-3). And according to Adebiyi, Dr. Stokes stated that since she was new to the Presidency, she would rely on Adebiyi to determine whether she fulfilled her job responsibilities until Dr. Stokes was acclimated to her position. *Id.*

Adebiyi didn't last much longer at South Suburban. As an administrator, Adebiyi had a one-year contract running "from July 1, 2018 until June 20, 2019."[5] *Id.* at ¶ 61. On February 5, 2019, Dr. Stokes wrote a memo to the Chairman of the Board and the Board of Trustees recommending that they not renew Adebiyi's contract. *Id.* at ¶ 62.

The memo gave a list of reasons why Dr. Stokes recommended the non-renewal. *Id.* The reasons included (1) "a lack of administrative management oversight and fiscal accountability;" (2) ongoing complaints from subordinates; (3) Adebiyi's "frivolous complaints against the College" about IT employees allegedly recording her personal data and emails; (4) a lack of urgency when addressing time sensitive matters; and (5) overall poor interpersonal and engagement skills. *See* Non-Renewal Memo (Dckt. No. 34-6, at 12–16 of 177).

Dr. Stokes – an African-American woman – offered a declaration stating that Adebiyi's race and prior complaints played no role in her recommendation for non-renewal. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 66 (Dckt. No. 36).

On February 11, 2019, Dr. Stokes terminated Adebiyi. That day, Dr. Stokes wrote Adebiyi and let her know that she had recommended non-renewal. *Id.* at ¶ 63. Dr. Stokes added that South Suburban relieved Adebiyi of her duties immediately, but would pay her through the

---

[5] Defendants' statement of facts refers to July 1, 2018 through June 20, 2019. *See* Defs.' Statement of Facts, at ¶ 60 (Dckt. No. 34). The Court assumes that it was a one-year contract running from July 1, 2018 to June 30, 2019, not June 20.

end of her contract. *Id*. Dr. Stokes also advised Adebiyi that she had due process rights to address the Board at a closed session on February 14, 2019. *Id.*

Adebiyi did not appear before the Board. *Id.* at ¶ 64. At that meeting, the Board accepted Dr. Stokes's recommendation. *Id.* at ¶ 65.

Adebiyi's termination on February 11 occurred just days before a scheduled meeting on February 14, 2019 with the Illinois Department of Human Rights ("IDHR") and the EEOC to discuss her discrimination and retaliation claims against the College and President Manning. *See* Adebiyi Dec., at ¶ 11 (Dckt. No. 36-3).

The record leaves the reader hanging when it comes to the February 14, 2019 meeting between the College and the IDHR. There is no evidence in the record about whether the meeting actually took place. There is no evidence about whether anything significant happened at that meeting. There is no evidence about who attended, or what was said. Again, maybe the meeting didn't take place at all. The record is silent.

On December 31, 2019, the EEOC issued Adebiyi a Notice of Rights to Sue. *See* Dismissal and Notice of Rights (Dckt. No. 1-2). She filed this lawsuit on March 30, 2020, within 90 days of the notice. *See* Cplt. (Dckt. No. 1).

Adebiyi brought four counts against South Suburban and Manning, the former President. *Id.* The first two counts are under Title VII. Count I is a race discrimination claim, and Count II is a retaliation claim. Count III is a race discrimination claim under 42 U.S.C. § 1981. Count IV is a breach of contract claim, alleging that South Suburban breached its Board Policy Manual and Personnel Policy Manual. In addition to other relief, Adebiyi sought punitive damages for each claim.

South Suburban and President Manning moved for summary judgment on all four claims. *See* Defs.' Mtn. for Summ. J. (Dckt. No. 32).

### Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts and reasonable inferences in the light most favorable to the nonmoving party. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

**Analysis**

The complaint includes claims of race discrimination (Counts I and III), retaliation (Count II), and breach of contract (Count IV). Defendants moved for summary judgment on all four counts.

The retaliation claim is the main event. In response to the motion, Adebiyi agreed to drop the two discrimination claims. And the breach of contract claim rests on the notion that Adebiyi suffered discrimination and retaliation.

For purposes of the motion for summary judgment, almost all of the analysis centers on whether there is sufficient evidence to support a finding of retaliation. The Court concludes that there is not. Based on the record, a reasonable jury could not return a verdict in Adebiyi's favor.

## I.     Race Discrimination (Counts I and III)

The complaint included two claims of race discrimination under Title VII (Count I) and section 1981 (Count III). Count I is against South Suburban, and Count III is against both South Suburban and President Manning.

Defendants moved for summary judgment on both claims. In response, Adebiyi agrees. She asks the Court to grant Defendants' motion in part, and she does not make any arguments about race discrimination. *See* Pl.'s Resp., at 1–2 (Dckt. No. 37) (arguing that "Defendants' motion for summary judgment should be granted in part and denied in part"). Her brief focuses exclusively on the retaliation claim and the breach of contract claim.

Adebiyi does not oppose Defendants' motion for summary judgment on the two race discrimination claims. She agrees that the motion is meritorious. The Court grants Defendants' motion for summary judgment on Count I (Title VII) and Count III (section 1981).

## II.    Retaliation (Count II)

Count II is a retaliation claim under Title VII against the College.  Adebiyi claims that South Suburban retaliated against her because she filed an EEOC charge.  In her view, the retaliation included reducing her pay, subjecting her to police force, and deciding not to renew her employment contract.  *See* Pl.'s Resp., at 6 (Dckt. No. 37); *see also* Cplt., at ¶ 37 (Dckt. No. 1).

To prevail on a retaliation claim, a plaintiff must prove that "(1) [s]he engaged in an activity protected by the statute; (2) [s]he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action."  *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018).

Traditionally, courts paved two avenues – the direct method, and the indirect method – for proving a retaliation claim.  *Id.*  "The direct method requires the plaintiff to simply present evidence satisfying the elements of the retaliation claim . . . ."  *Id.*

The indirect method involves the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under that method, a plaintiff has the initial burden to show that:  "(1) [s]he engaged in a protected activity, (2) [s]he performed [her] job duties according to [the] employer's legitimate expectations, (3) [s]he suffered an adverse action, and (4) [s]he was treated less favorably than similarly situated employees who did not engage in protected activity."  *Lewis*, 909 F.3d at 866; *see also Sitar*, 344 F.3d at 728.  If the plaintiff carries that load, "the burden then shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse action."  *Lewis*, 909 F.3d at 866.  And if the employer makes that showing, "the burden shifts back to the employee to prove that the employer's stated reason is mere pretext."  *Id.*

15

In recent years, the Seventh Circuit has pivoted away from the direct and indirect methods, and has moved toward a more holistic approach to the evidence. "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself – or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). "Whether a plaintiff offers direct or circumstantial evidence of discrimination, this court made clear in [*Ortiz*] that 'all evidence belongs in a single pile and must be evaluated as a whole.'" *Igasaki v. Illinois Dep't of Fin. & Prof'l. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (citing *Ortiz*, 834 F.3d at 766).

Adebiyi follows the *Ortiz* approach and looks at all the evidence as a whole. *See* Pl.'s Resp., at 7–8 (Dckt. No. 37). So, the Court will follow her lead and survey the evidence under *Ortiz.* The question is whether the evidence, viewed collectively, is substantial enough to support a finding of retaliation.

There is no dispute that Adebiyi engaged in a protected activity by filing her EEOC complaint. EEOC charges are "the most obvious form of statutorily protected activity." *Lewis*, 909 F.3d at 867 (quotation marks omitted) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012)). Employers can't punish employees for complaining to the EEOC about employers.

The parties also agree that South Suburban's termination and non-renewal of Adebiyi's contract constitute a materially adverse action. *See* Defs.' Mem. in Support of Mtn. for Summ. J., at 13 (Dckt. No. 33); Pl.'s Resp., at 6 (Dckt. No. 37).[6]

---

[6] The parties dispute whether there are any other materially adverse actions. Adebiyi argues that she suffered materially adverse actions when South Suburban reduced her pay and when it subjected her to police force. *See* Pl.'s Resp., at 6 (Dckt. No. 37). That position lacks merit. For starters, Adebiyi's brief barely mentions the alleged pay reduction and the involvement of the police. Her brief devotes only one sentence to that topic, and doesn't cite any authority to support the notion that the incidents constituted materially adverse actions. *Id.* That solitary sentence is entirely undeveloped and cites no authority, so

But the parties dispute whether there is a causal link between the EEOC charge in May 2018 and her termination in February 2019. To prove causation, a plaintiff must prove that "the desire to retaliate was the but-for cause of the challenged employment action." *See Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1019 (7th Cir. 2016); *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360.

"Direct evidence [of causation], such as an admission by the employer of unlawful animus, is sufficient but rare." *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017). A plaintiff can also prove causation through circumstantial evidence. *Id.*; *see also Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015). Circumstantial evidence might

---

any argument is waived. *See White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021). Even if her argument wasn't waived, the incidents do not amount to materially adverse actions. Adebiyi presented no evidence that South Suburban reduced her pay. Indeed, the parties agree that South Suburban *increased* her base salary and her stipend after she filed her EEOC charge. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 7, 27 (Dckt. No. 36). There is no evidence that other employees received greater pay increases. And while she didn't get part of her stipend on time in the fall of 2018, South Suburban did pay her eventually (*i.e.*, a few months later). *Id.* at ¶ 27; Adebiyi Dec., at ¶ 5 (Dckt. No. 36-3); Serna Dec., at ¶¶ 7–10 (Dckt. No. 34-5). A late stipend is the type of "petty slight or minor annoyance" that Title VII's anti-retaliation provision does not protect against. *See Lewis*, 909 F.3d at 867; *see also id.* at 868 (affirming a district court's finding that a late paycheck due to an administrative error did not amount to a materially adverse employment action). Also, Adebiyi presented no evidence supporting the inference that the delay had anything to do with her EEOC complaint, either. Similarly, Adebiyi provides no evidence that she suffered a materially adverse action when the two police officers collected her computer for a forensic exam. The parties agree that two College police officers accompanied a South Suburban employee from the IT department to take possession of her computer and store it in the police's safe until it could be inspected. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 40. Remember the context: the College collected her computer because she had accused the College of surreptitiously installing software to get her personal information. Adebiyi doesn't provide any evidence that the police officers used any force against her, or threatened her, or even said anything to her. Instead, she conclusively says that they intimated her, without offering any further details. *See* Adebiyi Dec., at ¶ 11 (Dckt. No. 36-3). The presence of two campus police officers to pick up a computer is not the sort of action that would dissuade a reasonable employee from filing or pursuing EEOC charges (without more). The Court therefore grants Defendants' motion for summary judgment to the extent that Adebiyi claims that she suffered materially adverse actions from an alleged reduction in pay or from an interaction with the police.

include "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *See Greengrass*, 776 F.3d at 486; *see also Gracia*, 842 F.3d at 1019. "When the plaintiff has 'assemble[d] from various scraps of circumstantial evidence enough to allow the trier of fact to conclude that it is more likely than not that discrimination lay behind the adverse action, then summary judgment for the defendant is not appropriate.'" *Greengrass*, 776 F.3d at 486 (quoting *Morgan v. SVT, LLC*, 724 F.3d 990, 996 (7th Cir. 2013)).

Adebiyi makes a few arguments to support a finding of causation. As she sees it, the timing of her termination was suspicious, and South Suburban had pretextual reasons for her termination. She argues that South Suburban treated other employees differently, and that South Suburban harbored a longstanding animus towards her.

Viewing the evidence as a whole, in the light most favorable to Adebiyi, the evidence could not support a finding by a reasonable jury that the College retaliated against her for complaining to the EEOC.

Adebiyi begins by arguing that the timing of her termination was suspicious. *See* Pl.'s Resp., at ¶ 7 (Dckt. No. 37). She points out that she was terminated while her EEOC charge was still pending. *See* Adebiyi Dec., at ¶ 25 (Dckt. No. 36-3). And South Suburban terminated her on February 11, 2019, only a few days before a pre-scheduled meeting on February 14, 2019 between the College and the IDHR to discuss her charges. *Id.* at ¶ 11.

Suspicious timing is generally found when "an adverse employment action follows close on the heels of protected expression." *See Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). Whether the amount of time that lapsed between the protected activity and the materially

adverse action is suspicious "depends on the context." *See Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011).

Here, the termination did not take place "close on the heels" of the protected activity. *See Kidwell*, 679 F.3d at 966. Adebiyi filed her EEOC complaint in May 2018, and she was let go in February 2019. That's nine months. If the College wanted to terminated Adebiyi for complaining to the EEOC, it had months to do so.

Nine months is quite a stretch of time. It is too much of a stretch to give rise to an inference of retaliation. The Seventh Circuit has rejected the inference of retaliation for shorter periods of time. *See, e.g.*, *Kidwell*, 679 F.3d at 966–67 (concluding that a five-week lapse alone did not support an inference of causation); *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (finding a seven-week interval insufficient); *Milligan v. Bd. of Trs. of S. Illinois Univ.*, 686 F.3d 378, 390 (7th Cir. 2012) (finding a two-month gap insufficient); *Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 898 (7th Cir. 2015) (finding a six-month gap too long); *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 569 (7th Cir. 2015) (concluding that a gap of at least seven months was too long to establish causation without other evidence).

It is true that the termination took place only a few days before a meeting with the IDHR and the College. Dr. Stokes terminated Adebiyi on February 11, 2019, and the Board accepted the recommendation for non-renewal in a meeting on February 14, 2019. That same day, the College and the IDHR had a pre-scheduled meeting about her claims. *See* Adebiyi Dec., at ¶ 11 (Dckt. No. 36-3). So, South Suburban fired Adebiyi the same week that the College and the IDHR planned to meet about her charge.

That said, the record does not include much information about that meeting. Adebiyi mentions it once in her declaration, and she doesn't offer many details: "I was terminated

Monday February 11, 2019 during the pendency of the IDHR/EEOC investigation and just prior to a meeting scheduled Thursday February 14, 2019 with the College and the IDHR regarding my discrimination and retaliation claims against the College and Manning." *Id.*

That sentence leaves quite a few unanswered questions. Adebiyi does not address who knew about the meeting, and who planned to attend. She does not reveal the specific purpose of the meeting, or when the IDHR and the College had scheduled the meeting. If that meeting was particularly important, she doesn't explain why.

A preceding sentence provides a little context, adding that it wasn't the first meeting. "On May 17, 2018, I filed [the EEOC Charge]. . . . Subsequently, I had *meetings* with the Illinois Department of Human Rights Commission [sic] and the College regarding my complaint." *Id.* (emphasis added). So there were other meetings, too. Little else is known.

Perhaps most importantly, Adebiyi does not provide evidence that Dr. Stokes knew about the meeting with the IDHR on February 14, 2019. Retaliation for a protected activity presupposes knowledge of a protected activity. Dr. Stokes couldn't terminate Adebiyi based on a meeting with the IDHR if Dr. Stokes didn't know about the meeting with the IDHR.

Overall, the timing of the termination is not particularly suspicious. The termination took place nine months after the EEOC charge. The termination happened a few days before a meeting, but there is no reason to think that the decisionmaker knew about the meeting. *Cf. Greengrass*, 776 F.3d at 486.

Again, on its own, suspicious timing is usually insufficient to support an inference of a retaliatory motive. *See Leonard v. E. Illinois Univ.*, 606 F.3d 428, 432–33 (7th Cir. 2010); *Gracia*, 842 F.3d at 1021. As a result, even if the timing here had a suspicious flavor, Adebiyi needed to offer other evidence to support an inference of causation.

20

Adebiyi does point to other evidence, but none of it moves the needle.

She says that South Suburban's reasons for her termination were pretextual. Dr. Stokes provided the Board with a long list of reasons why she recommended non-renewal. Those reasons included (1) "a lack of administrative management oversight and fiscal accountability;" (2) ongoing complaints from subordinates; (3) Adebiyi's "frivolous complaints against the College" when she alleged IT employees recorded her personal data and took her personal emails; (4) a lack of urgency when addressing time sensitive matters; and (5) overall poor interpersonal and engagement skills. *See* Non-Renewal Memo (Dckt. No. 34-6, at 12–16 of 177). The record includes a detailed declaration from Dr. Stokes, who gave a long list of "numerous concerns about her job performance." *See* Stokes Dec., at ¶ 19 (Dckt. No. 34-6).

Pretext is more than faulty reasoning or bad judgment; pretext is a lie or a phony reason. *See Barnes v. Bd. of Trs. of Univ. of Illinois*, 946 F.3d 384, 389 (7th Cir. 2020). To show pretext, a plaintiff must identify "weaknesses, implausibilities, inconsistencies, or contradictions" in an employer's reasoning that a reasonable person would find unworthy of credence. *See de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 561 (7th Cir. 2019). "[T]he question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 380 (7th Cir. 2020). "[T]he only question is whether the employer's proffered reason . . . was a lie." *Coleman*, 667 F.3d at 852.

Adebiyi provides three arguments why South Suburban's reasons were pretextual.

First, Adebiyi points out that the College fired her only a month after receiving a performance evaluation where Dr. Stokes rated Adebiyi as "satisfactory in most items." *See* Pl.'s Resp., at 7 (Dckt. No. 37).

21

As an initial matter, a positive work history, standing alone, does not demonstrate pretext. "[P]ast positive evaluations do not guarantee future employment." *See Igasaki*, 988 F.3d at 959. When it comes to employment decisions, what's past is not always prologue.

Even then, the rating by Dr. Stokes was not entirely glowing. It is true that Dr. Stokes rated Adebiyi satisfactorily just a month before her termination. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 59 (Dckt. No. 36). But Dr. Stokes also believed that a satisfactory rating was insufficient for a Vice President. *Id.* Basically, being just OK was not OK.

Adebiyi rejects the notion that a "satisfactory rating was not sufficient to maintain my position," based on her "experience with the College." *See* Adebiyi Dec., at ¶ 21 (Dckt. No. 36-3). But Adebiyi comes forward with no evidence of any comparable employees. That is, she does not offer evidence of any similarly situated employees who received a comparable rating from Dr. Stokes and kept their jobs.

Adebiyi also points out that Dr. Stokes looked to her to evaluate her own performance. Dr. Stokes told Adebiyi that "she would have to rely on me to decide whether I had fulfilled my job responsibilities until she was later acclimated in her position in the coming years." *Id.*

A boss does not have to accept an employee's self-evaluation. A supervisor could conclude that an employee is underperforming, even if the employee believes that she is meeting expectations. A self-evaluation is no guarantee that the boss will see things the same way. Dr. Stokes could rely on Adebiyi's self-evaluations and, at the same time, conclude that Adebiyi was underperforming. Beauty may be in the eye of the beholder, but performance is in the eye of the boss.

Also, the fact that Dr. Stokes gave Adebiyi mostly satisfactory ratings does not carry much weight, given that Dr. Stokes gave higher ratings to her other direct reports. *See* Pl.'s

22

Resp. to Defs.' Statement of Facts, at ¶ 60 (Dckt. No. 36). Adebiyi received lower marks than her colleagues, which supports the inference that she was underperforming relative to her coworkers in the eyes of Dr. Stokes.

Dr. Stokes started as President just three months before Adebiyi's evaluation and four months before Adebiyi's termination. And during that period, Dr. Stokes met and learned more about Adebiyi's performance. *Id.* at ¶ 50. A satisfactory performance evaluation by a boss getting up to speed does not, by itself, indicate pretext.

Second, Adebiyi relies on the fact that President Manning never had performance issues with Adebiyi during his tenure. The fact that President Manning gave positive ratings to Adebiyi does not lend much of a hand.

At the time of Adebiyi's termination, President Manning was *former* President Manning. He left in the fall of 2018, and no longer worked for South Suburban when Adebiyi was terminated in February 2019. President Manning's assessment of Adebiyi's performance does not shed much light on Dr. Stokes's assessment of her performance. *See Arrigo v. Link*, 836 F.3d 787, 796 (7th Cir. 2016); *Igasaki*, 988 F.3d at 959.

Finally, Adebiyi argues that Dr. Stokes took issue with her job performance for reasons that fell outside of her job duties. The evidence does not support that argument. Dr. Stokes provided the Board with a long list of complaints and concerns. If anything, the list of reasons seems to cover significant problems with Adebiyi's core duties.

The performance deficiencies included: (1) lack of administrative management oversight and fiscal accountability because Adebiyi did not initiate standing meetings with the administrators she supervised and could not answer questions about spending patterns in her department; (2) a lack of responsibility in performing her senior executive administrator roles

23

because she did not take an active role in reviewing a tenure candidate; (3) a failure to comply with Pigatti and Dean Burton's recommendations (later upheld by the Board) to participate in a communication training plan and complete a Communication Pathway Chart; (4) ongoing complaints from subordinates; (5) Adebiyi's "frivolous complaints" related to her computer; (6) lack of urgency in addressing sensitive and critical matters; and (7) overall poor interpersonal and engagement skills. *See* Non-Renewal Memo (Dckt. No. 34-6, at 12–16 of 177).

Adebiyi takes issue with each of those concerns, arguing that they were immaterial or fell outside of her job duties. In reality, Adebiyi merely disagrees with South Suburban's reasons for terminating her. But disagreement isn't enough to show pretext. *See Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 646 (7th Cir. 2013).

For example, Adebiyi contends that impromptu questions about fiscal accountability were insignificant to her role and that "immediate knowledge to that question had never been a requirement." *See* Adebiyi Dec., at ¶ 16 (Dckt. No. 36-3). Adebiyi does not deny that she needed to know about her department's finances, or that such knowledge was part of her job duties. Instead, she argues that former President Manning didn't require her to know that information off the top of her head.

A new boss can bring new expectations. And in any event, having a handle on the flow of funds does not seem outside her job responsibilities.

Dr. Stokes also found fault with Adebiyi in several other ways that fell directly within her responsibilities. Dr. Stokes pointed to Adebiyi's lack of administrative management oversight, lack of urgency when addressing time sensitive matters, and poor interpersonal and engagement skills. *See* Non-Renewal Memo (Dckt. No. 34-6, at 12–16 of 177). When it comes to describing the responsibilities of an executive, those areas seem right down Main Street.

24

Adebiyi may have believed that Dr. Stokes's concerns were immaterial or imprudent, but Adebiyi's opinion about her own job performance does not create a genuine issue of material fact about pretext. *See Russell v. Acme–Evans Co.*, 51 F.3d 64, 69 (7th Cir. 1995) (holding that plaintiff's own opinion that his performance was adequate did not create a genuine factual dispute over whether the defendant-employer's performance criticisms were pretextual); *Wyninger v. New Venture Gear, Inc.,* 361 F.3d 965, 980 (7th Cir. 2004) ("An employee's self-evaluation cannot create an issue of fact about an employer's honest assessment of inadequate performance.").

Ultimately, evidence of pretext is "evidence that the employer's proffered reason for the discharge is patently inconsistent with the evidence before the court." *Mack v. Great Dane Trailers*, 308 F.3d 776, 784 (7th Cir. 2002) (citation and quotation marks omitted). "'Pretext means a dishonest explanation, a lie rather than an oddity or an error.'" *Id.* (quoting *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001)).

Adebiyi may believe that her termination was unjustified. And maybe she's right. Maybe, just maybe, she was performing adequately. But that's not the question here. The question is not whether the College made the right decision. "[A] pretext analysis evaluates the honesty of the employer's explanation, not its validity or reasonableness." *Seymour-Reed v. Forest Preserve Dist. of DuPage Cnty.*, 752 F. App'x 331, 335 (7th Cir. 2018). Here, Adebiyi has not presented evidence that the College gave phony reasons for letting her go.

Next, Adebiyi argues that South Suburban treated other employees differently. She says that "other employees created clear liability issues for the College yet they were renewed, however, Adebiyi was considered a liability concern" and ultimately terminated. *See* Pl.'s Resp., at 8 (Dckt. No. 37). Circumstantial evidence of discrimination can include evidence that other

25

similarly situated employees were treated differently. *See Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 723 (7th Cir. 2018). While similarly situated employees "need not be identical in every conceivable way, similarly situated employees must be directly comparable to the plaintiff in all material respects." *Id.* (cleaned up). The goal is to determine whether there is discrimination by eliminating "other possible explanatory variables, 'such as differing roles, performance histories, or decision-making personnel.'" *Coleman*, 667 F.3d at 846 (quoting *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)).

As a result, there must be enough common factors between the plaintiff and the alleged similarly situated employee "to allow for a meaningful comparison in order to divine whether intentional discrimination was at play." *Skiba*, 884 F.3d at 723 (cleaned up). Typically, a plaintiff must show that "that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (cleaned up); *see also Coleman*, 667 F.3d at 847.

Adebiyi did not make any such showing here. Instead, Adebiyi offers a declaration stating that "the College protected Caucasians and renewed their employment contracts despite multiple witness accounts or video evidence against those who committed, sexual harassment, racial profiling and trumped up felonious accusations against students of color." *See* Adebiyi Dec., at ¶ 16 (Dckt. No. 36-6).

The declaration offers a few more details, but not much, and they leave much to be desired. Adebiyi fails to lay the foundation necessary to support a showing that other employees were similarly situated and received better treatment. There is no information about their

26

employment history, or who they reported to, or whether they needed to follow the same standards, or whether they performed at the same level as Adebiyi.

The declaration is entirely vague, embracing a high level of generality. It is only a little better than a blanket statement that the College treated her worse than other people. And that's not enough. As the plaintiff, Adebiyi "bears the burden of showing the individuals [s]he identifies are similarly situated." *See Skiba*, 884 F.3d at 724; *see also Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (holding that "we cannot compare [an employer's] treatment of [a plaintiff] and [a co-worker]" if the plaintiff "fail[s] to meet her burden of establishing that [the co-worker] is a similarly situated employee"). Without specifics, there is no basis for a finding that the College treated similarly situated employees differently.

Finally, Adebiyi says that South Suburban harbored a longstanding animus toward her. Adebiyi argues that "Manning authorized unnecessary use of police force against Adebiyi while admitting he had never taken that approach with any other individuals at the college," and that this use of force is evidence of a longstanding animus. *See* Pl.'s Resp., at 8 (Dckt. No. 37).

As this Court already explained, the use of two campus police officers to collect Adebiyi's computer for safekeeping in the campus police safe is not evidence of animus. Two campus police officers accompanied the director of the IT department to establish a chain of custody for Adebiyi's computer and take the computer to the campus police safe before a forensic auditor examined it. *See* Manning Dep., at 18:12-17 (Dckt. No. 36-2). They were there to support information-gathering about Adebiyi's own accusations.

Plaintiff's argument is misleading. The police did not "use . . . force" against Adebiyi, in the natural sense of that phrase. There is no evidence that the police officers said anything to

27

Adebiyi, or threatened her, or used force against her, or otherwise mistreated her in any way. Adebiyi may not have liked the presence of the officers, but it is not evidence of animus.

Viewing each piece of evidence in isolation, Adebiyi has not built a case of retaliation that is strong enough to get to a jury. The evidence does not look any stronger when viewed as a whole. The College let Adebiyi go after a string of performance issues, and made that decision long after Adebiyi complained to the EEOC. Her performance review by the new President was lackluster, and it was below the level of others on the executive management team. Maybe President Manning thought that Adebiyi was performing well enough to stay on board, but Dr. Stokes had the ability to draw her own conclusions. The record cannot support the conclusion that the College gave a phony reason for parting ways with Adebiyi.

After viewing the evidence of causation as a whole, no reasonable factfinder could conclude that Adebiyi's EEOC charge constituted the but-for cause of her termination. Adebiyi presented the Court with a smattering of arguments, but after surveying the whole record, the Court cannot conclude that "it is more likely than not that discrimination lay behind the adverse action." *See Morgan v. SVT, LLC*, 724 F.3d 990, 996 (7th Cir. 2013).

The Court grants Defendants' motion for summary judgment on Adebiyi's retaliation claim.

## III.    Breach of Contract (Count IV)

Finally, Adebiyi brings a breach of contract claim against the College. She alleged that South Suburban breached an anti-discrimination provision located in a policy manual. *See* Cplt., at ¶¶ 59–62 (Dckt. No. 1).

Her claim suffers from two basic problems. First, Adebiyi failed to come forward with evidence that the College discriminated against her based on her race, or retaliated against her for

28

engaging in a protected activity. The evidence does not support a race discrimination claim or a retaliation claim. So the evidence does not support a breach of contract claim about race discrimination or retaliation, either. There is no evidence to support a finding of race discrimination or retaliation, regardless of whether it comes packaged as a statutory or contractual claim.

Second, Adebiyi failed to provide any evidence that a policy manual created contractual rights. Adebiyi does not offer much of a response to the motion for summary judgment on this claim. She simply responded with a short paragraph, stating that "she has provided evidence that she was nonrenewed based on prohibited discriminatory and retaliatory conduct and subjected to discriminatory and retaliatory treatment beforehand," and citing wholesale to her declaration. *See* Pl.'s Resp., at 9 (Dckt. No. 37).

A basic part of a breach of contract claim is the existence of contractual rights. To support her claim, Adebiyi would need to establish that she had a contractual right to be free from discrimination and retaliation.

"[E]mployment handbooks have the potential to form contracts between employers and workers" *Moss v. Martin*, 473 F.3d 694, 700 (7th Cir. 2007). Specifically, the Illinois Supreme Court has held that "an employee handbook or other policy statement creates enforceable contractual rights if the traditional requirements for contract formation are present." *Duldulao v. Saint Mary of Nazareth Hosp. Ctr.*, 115 Ill. 2d 482, 106 Ill. Dec. 8, 505 N.E.2d 314, 317–18 (1987); *see also Boswell v. City of Chicago*, 2016 IL App (1st) 150871, 410 Ill. Dec. 154, 69 N.E.3d 379, 383 (2016); *Ivory v. Specialized Assistance Servs., Inc.*, 365 Ill. App. 3d 544, 302 Ill. Dec. 793, 850 N.E.2d 230, 232 (2006).

An employee policy manual is not automatically part of an employment contract. Illinois law sets three requirements to turn a policy manual into a contractual right. "First, the language of the policy statement must contain a promise clear enough that an employee would reasonably believe that an offer has been made. Second, the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. Third, the employee must accept the offer by commencing or continuing to work after learning of the policy statement." *Id.*; *see also Cromwell Border v. City of Crystal Lake*, 75 F.3d 270, 273 (7th Cir. 1996); *Smoler v. Bd. of Educ. for W. Northfield Sch. Dist. #31*, 524 F. Supp. 3d 794, 812 (N.D. Ill. 2021); *Bradley v. Wolf Retail Sols. I, Inc.*, 443 F. Supp. 3d 959, 961 (N.D. Ill. 2019). "When these conditions are present, then the employee's continued work constitutes consideration for the promises contained in the statement, and under traditional principles a valid contract is formed." *Duldulao*, 505 N.E.2d at 318.

Here, Adebiyi makes no such showing. She does not discuss the specific language of the policy manual, and does not address whether it made a promise with the requisite amount of clarity. Adebiyi did not offer any evidence about how the manual was disseminated. And she did not offer evidence that she accepted the manual as part of the terms of her employment.

Adebiyi did not quote the language of the policy manual in her response brief. She gave this Court no reason to conclude that the manual created a contractual right. Maybe she did, in fact, have that contractual right. But if so, summary judgment was the time to show it. "[S]ummary judgment is 'not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.'" *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005)).

In sum, the evidence in the record does not support a claim of discrimination or retaliation. The statutory claims of discrimination and retaliation failed, and the contractual claim failed, too. Even if Adebiyi had come forward with evidence of discrimination or retaliation, she did not lay the foundation for her claim by showing the existence of a contractual right. The Court grants summary judgment to the College on Count IV.

### Conclusion

Defendants' motion for summary judgment is granted. The Court will enter final judgment in favor of South Suburban College and President Manning on all claims.


Date: August 4, 2022 _____

Steven C. Seeger
United States District Judge